Filed 1/20/16

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PACIFIC SHORES PROPERTY OWNERS ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DEPARTMENT OF FISH AND WILDLIFE et al., <br><br> Defendants and Appellants. | C070201 <br><br> (Super. Ct. No. 07AS01615) |

APPEAL from a judgment of the Superior Court of Sacramento County, David De Alba, Judge. Remanded with directions, affirmed in part, and reversed in part.

The Smith Firm and Kelly T. Smith for Plaintiffs and Appellants.

Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Deborah A. Sivas, Alicia E. Thesing, Matthew J. Sanders, and Lauren M. Gollaher on behalf of Earl McGrew, Maxine Curtis, Lynda Schoonover, Nicole Solovskoy, and Northcoast Environmental Center, as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, John A. Saurenman, Senior Assistant Attorney General, Daniel L. Siegel, Deborah M. Smith, Carolyn Nelson Rowan, and Christie H. Vosburg, Deputy Attorneys General, for Defendants and Appellants.

In this inverse condemnation action, we face a unique situation where a state agency assumes control of a local flood control process, and it determines to provide less flood protection than historically provided by a local agency in order to protect environmental resources. We affirm the trial court's judgment finding the state agency liable in inverse condemnation for a physical taking of plaintiffs' properties, and not liable for a regulatory taking. We reverse the judgment to the extent the court found another state permitting agency liable in inverse condemnation.

Since the late 1800's, Del Norte County residents, and eventually the County of Del Norte (County), regularly breached a sandbar when water levels in a large coastal lagoon that the sandbar separated from the ocean rose above four feet mean sea level (msl). This process protected lands along the lagoon's shore devoted to agricultural and residential uses against flooding.

In the early 1960's, the County approved a large residential subdivision along the lagoon's shore. Developers designed the subdivision on the premise the sandbar would continue to be breached when the lagoon's water level exceeded four feet msl. Buyers, including plaintiffs, acquired the lots, but they never developed them.

Federal and state environmental legislation adopted in the 1970's imposed permitting requirements on developing the subdivision and on breaching the sandbar. The County obtained federal approval from the United States Army Corps of Engineers (the Army Corps) to continue breaching at four feet msl for 10 years. During that time, the state Department of Fish and Game (now the Department of Fish and Wildlife (the Department)) began adopting plans and purchasing properties to protect the lagoon and its significant environmental resources. The Department also gained possession of the sandbar, and it authorized the County by contract to continue breaching at four feet msl.

When the 10-year permit expired in 1987, the County sought to obtain permits from the Army Corps and the California Coastal Commission (Commission), which had obtained land use jurisdiction over the sandbar and the subdivision, to continue breaching

2

at four feet msl. However, the Department believed the breaching adversely impacted the lagoon's environment. It sought to limit breaching to times when the lagoon's water level reached six feet msl and, in 1990, it jointly applied with the County for federal and state permits to breach at that level. When other agencies expressed concern about breaching at six feet msl, the Department withdrew its permit applications. From 1989 until 2005, no permanent or long-term permit to breach the sandbar was issued. Over those 16 years, while the Department submitted and withdrew various applications to breach at six and then eight feet msl, breaching occurred only pursuant to emergency and interim permits issued by the Commission when the lagoon's water level rose above eight feet msl and began flooding properties and roads in the residential subdivision.

Finally, in 2005, the Department approved a management plan for the lagoon that called for breaching the sandbar at eight to 10 feet msl. The Commission and the Army Corps approved permits to breach at that level. Plaintiffs, whose properties suffered flooding damage when the lagoon level rose above eight feet msl, filed this action in 2007 for inverse condemnation. They alleged they suffered a physical taking from the Department's actions, and a regulatory taking by the Commission retaining land use jurisdiction over the subdivision throughout this time instead of transferring it to the County. Plaintiffs also sought precondemnation damages and statutory attorney fees.

The trial court found the Department and the Commission (collectively, the State) liable for a physical taking and awarded damages, but it concluded plaintiffs' claim for a regulatory taking was barred. It rejected the State's arguments that the statute of limitations barred plaintiffs' complaint. It awarded plaintiffs attorney fees in the amount they incurred under a contingency agreement, but it denied plaintiffs any precondemnation damages.

Both the State and plaintiffs appeal. The State contends the trial court erred because (1) plaintiffs' complaint was time barred; (2) the State could not be liable because it owed no duty to provide any flood protection; and (3) it also could not be

3

liable because any protection it provided, it did so reasonably. Alternatively, the State asks us to grant it a flowage easement over plaintiffs' properties.

The plaintiffs contend the trial court erred by (1) denying their claim for a regulatory taking; (2) denying their claim for precondemnation damages; and (3) not awarding reasonable attorney fees based on the hours expended and rates charged by counsel.

Except to reverse the judgment against the Commission, we affirm the judgment and remand the matter for the trial court to grant the Department a flowage easement over plaintiffs' properties. Regarding the State's appeal, we hold: first, plaintiffs' cause of action for a physical taking against the Commission was not timely, but the cause against the Department was timely, as it did not accrue until the Department's actions against plaintiffs' properties stabilized, a point achieved in 2005 when the Department obtained a long-term development permit to breach the sandbar. Plaintiffs filed their action within the three-year limitation period after their cause accrued.

Second, the Department is strictly liable for the damages it caused in this instance. Strict liability applies because the Department intentionally designed the breaching to flood plaintiffs' properties by reducing the flood protection plaintiffs had historically enjoyed, and its primary purpose for doing so was not to provide flood protection, but to protect environmental resources.

Third, even if the State was not strictly liable, it still would be liable under a standard of reasonableness applied to inverse condemnation actions for damages caused by flood control projects. Substantial evidence supports the trial court's determination that because of the Department's intentional actions, plaintiffs contributed more than their fair share to the Department's efforts to protect environmental resources.

Regarding plaintiffs' appeal, we hold: first, the trial court correctly ruled their cause of action for regulatory taking was barred, as plaintiffs failed to comply with California law governing recovery for a regulatory taking. Plaintiffs were required to

4

seek a development permit and challenge the application of any permit restriction by petition for writ of mandate before bringing an action for inverse condemnation based on a regulatory taking. Plaintiffs did not do this. Also, the administrative jurisdiction exception to the prerequisites for bringing an inverse condemnation action does not apply here.

Second, the trial court correctly denied plaintiffs' request for precondemnation damages, as the Commission's retaining land use authority over the subdivision was not improper or unreasonable.

Third, the trial court correctly awarded attorney fees in this instance in accordance with the terms of plaintiffs' contingency agreement, which limited fee awards to the amount of fees plaintiffs had actually incurred.

We remand the matter solely for the trial court to grant the Department flowage easements over plaintiffs' properties.

FACTS

We present a detailed history of events leading up to this case primarily to address whether the action is barred by the statute of limitations.

Lake Earl and Lake Tolowa are located approximately four miles north of Crescent City and adjacent to the Pacific Ocean. Although referred to as lakes, Lake Earl and Lake Tolowa form a coastal lagoon connected to each other by a narrow channel.[1] A sandbar separates the lake's western edge from the Pacific Ocean. The lake's normal water level behind the sandbar is four feet above msl. Heavy precipitation and runoff, and occasional overflow from the nearby Smith River, raise the lake's level.[2] When the

---

[1] We refer to them collectively as Lake Earl.

[2] Rainfall in the Crescent City area averages 66.1 inches per year. The Smith River, located north of Lake Earl, floods on average once every eight to 10 years, and when it does, its waters flow across the surrounding land and into the lake.

lake reaches a level of 10 to 14 feet above msl, the water overflows the sandbar and erodes an outlet to the ocean, referred to by the parties as the breaching site. As the outlet at the breaching site increases in size, lake water flows into the ocean and the lake's water level drops until reaching equilibrium with the average tides. The lake comes under marine tidal influence until storms, wind, and tides rebuild the sandbar. Lake Earl rises again, and the process repeats.

Lake Earl is California's largest coastal lagoon. It supports numerous habitat types and provides a resting and wintering area for over 250 species of birds on the Pacific Flyway. Forty species of mammals occur within its environs. Fourteen endangered or threatened species of plants and animals occur there, as do 25 fish, amphibian, and avian species of concern.

By 1869, settlers had built sawmills on Lake Earl's eastern shore. The establishment of the timber industry began the long-standing controversy over lake levels that is at issue in this case. Mill operators preferred higher water levels for transporting and storing logs. Farmers wanted lower water levels to reclaim land for pasture and prevent the seasonal flooding of lands already reclaimed. "This controversy over lake levels took the form of legislative action, lawsuits, construction of water control structures, digging ditches in the lake bottom, artificial opening and closing the sandbar, as well as face-to-face confrontations."

The controversy between timber and agriculture ended in 1891 with the building of a railroad to move timber. Agricultural interests continued to manipulate the lake's water levels by manually breaching the sandbar, but, beginning in the 1920's, conservationists and recreationists began to voice concern over the artificial breaching.[3] Agricultural and eventually residential interests prevailed in the debate for a time, and they established farms and homes in areas where the lake level would naturally fluctuate

---

**3**     People would use horse-drawn equipment and hand tools to breach the sandbar.

if no breaching occurred. Government studies in 1948, 1954, and 1962 concluded any kind of permanent flood control device to prevent the lake level from rising was economically infeasible.

In 1955, the County, through the Del Norte County Flood Control District, assumed responsibility for manually breaching the sandbar for flood control. To do this, it trucks bulldozers to the breaching site and excavates a large channel through the sandbar. Heavy rainstorms and surf could make it impractical or unsafe to perform a breaching. Until 1987, the County attempted to breach the sandbar whenever Lake Earl rose above four feet msl. When it did breach at that level, the lake's water level would often drop to below one and one-half feet msl. Despite the efforts of settlers, farmers, and eventually the County, records show Lake Earl exceeded four feet msl in 1861, 1890, 1927, 1950, 1953, and 1955.

In 1963, the County approved development of a residential subdivision on Lake Earl's northwest shore. The subdivision, called Pacific Shores, comprises 1,524 half-acre lots over 1,486 acres. The County paved roads and constructed drainage ditches within the subdivision and installed an electrical transmission line, but no other infrastructure was, or has been, constructed. Despite the lack of infrastructure, the lots sold out in two years, primarily to residents of Southern California. Plaintiffs Thomas W. Resch and the Pacific Shores Property Owners Association (Owners Association) own lots in Pacific Shores.

The Pacific Shores drainage system was designed to operate on the assumption Lake Earl's water level would not exceed four feet above msl. If the lake's water level rose to between four and eight feet msl, the drainage ditches would fill with water and not drain. If the water level rose above eight feet msl, the water would begin flooding the subdivision's roads. The higher the water level, the more roads the lake would flood.

A real estate subdivision disclosure written in 1963 and given to purchasers of Pacific Shores lots stated the lots were safe but could be subject to a risk of flooding. It

7

informed purchasers it was the County's opinion that "flood hazards have been removed from this subdivision to the point public health and safety will be protected. The [County] believes that a time could come, due to the physical location of the subdivision, that flooding could occur, where the Smith River breaks into the Lake Earl watershed." The disclosure did not inform buyers of any risk of flooding due to rising lake levels that occur without any flooding from the Smith River.

Despite regular breaching by the County, Lake Earl's water level exceeded four feet msl in 1964, 1966, 1970, and 1972. The County chose not to breach the sandbar in the 1972 incident because flooding conditions made the work unsafe. The county department of public health informed the board of supervisors that year that it had warned people interested in buying residential property in the Lake Earl flood plain that the property is subject to flooding. Later that year, the department of public health told the Owners Association it had informed by certified mail all lot owners who had requested information of the hazards associated with Pacific Shores, including the drainage problems and localized flooding. At trial, plaintiff Resch, president of the Owners Association, testified he never received any such notice and was not aware if the Owners Association received the notice.

In 1975, the Owners Association commissioned an engineering firm to investigate the feasibility of developing Pacific Shores. The firm recommended the Owners Association form a community services district in order to assess landowners to fund construction and operation of sewer and water systems. Because the water table was shallow, individual septic tanks and individual wells could not be used. The report also recommended building a levee to protect against flooding from the Smith River, and regularly breaching the sandbar to keep Lake Earl low.

No water, sewer, or flood control projects have ever been built for Pacific Shores. The Owners Association in 1987 created a special water district, the Pacific Shores Subdivision California Water District (Pacific Shores Water District), to provide water

and sewage infrastructure, but the district was dissolved in 2007 because, despite making attempts to develop the subdivision, it had been, and continued to be, unable to do so. To date, no development, other than the placement of a trailer, has occurred at Pacific Shores since the lots were first sold. Lot owners have used their properties for occasional camping, but nothing more.

In the 1970's, new federal and state environmental legislation imposed additional regulatory and permitting requirements on the Pacific Shores subdivision. Congress adopted the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.) (NEPA), which required environmental review for federally approved projects. It adopted the Clean Water Act (33 U.S.C. § 1251 et seq.), which vested regulatory authority over wetlands in the Army Corps, in addition to the authority the Corps exercised under the Rivers and Harbors Act (33 U.S.C. § 403 et seq.). Congress also adopted the Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.), which granted regulatory authority to the United States Fish and Wildlife Service (USFWS) over endangered animal and plant species.

During the same time period, the California Legislature adopted the California Environmental Quality Act (Pub. Resources Code, § 21000) (CEQA), and the Coastal Act (Pub. Resources Code, § 30001 et seq.). CEQA, in general, required state and local agencies to conduct environmental review for all development projects needing their approval. The Coastal Act prohibited development in the coastal zone, in which Pacific Shores lies, unless the developer obtained a development permit from the Commission or a local agency whose local coastal program governing land use in the coastal zone had been approved by the Commission. (Pub. Resources Code, § 30600, subd. (a).) These statutes significantly broadened the state and federal governments' regulatory and environmental control over Pacific Shores.

The County in 1976 obtained a permit from the Army Corps to continue breaching the sandbar when Lake Earl rose above four feet msl. The permit was valid for 10 years.

9

The County breached the sandbar during most of the permitted years. In 1979, the lake exceeded four feet msl and was not breached until lake levels reached over eight feet msl.

In 1979, the Department began to take steps to protect Lake Earl's environmental resources. Along with the state Department of Parks and Recreation, the Department purchased almost all of Lake Earl, most of its shoreline, and several thousand adjacent acres to establish the Lake Earl Wildlife Area. The Lake Earl Wildlife Area is a habitat management area, and part of a statewide effort to protect, enhance, and manage coastal wetlands. The State Lands Commission (SLC) owns the remaining portion of Lake Earl, including the breaching site, which the Department leases. In 1980, the Department entered into an agreement with the County to continue allowing breaching at the breaching site.

In addition to establishing the Lake Earl Wildlife Area, the Department in 1979 began to acquire lots in the Pacific Shores subdivision from willing sellers that were at or below the 10 feet msl contour. The Department now owns 779 lots in the subdivision.

In 1981, the County sought approval of its local coastal program's land use plan from the Commission, as required by the Coastal Act. The land use plan proposed designating Pacific Shores for urban residential development. The Commission certified the land use plan except as it related to Pacific Shores. It declared the subdivision to be an "area of deferred certification" due to concerns about development impacts on numerous environmental resources such as wetlands and habitat located in the subdivision, and about the subdivision suffering seasonal inundation from Lake Earl. Designating the subdivision as an area of deferred certification obligated the property owners, before developing their lots, to obtain a development permit directly from the Commission instead of local authorities.[4] (Pub. Resources Code, § 30600, subd (c).)

---

[4] A Commission planning analyst stated at trial the term "white hole," in Commission parlance, referred, among other things, to an area of deferred certification.

10

In 1987, after its 10-year breaching permit expired, the County applied to the Army Corps for a five-year permit to breach the sandbar when Lake Earl reached four feet msl. However, the Department expressed concern that breaching the sandbar when the lake level was at four feet msl was adversely impacting wildlife and their habitat at the lake. Lower water levels reduced fish and wetland habitat, adversely affecting fish and wildlife species. Lower levels also raised water temperatures, adversely impacting anadromous fish. The Department was working with the Department of Water Resources (DWR) to conduct a hydrologic study of the lake to determine the true impacts of the lake's fluctuating levels on resources and property interests. Pending that study, DWR proposed breaching to occur at six feet msl and only between October and April unless county roads were in imminent peril of flooding. It believed breaching at six feet msl would better protect the lake's fish and wildlife resources while at the same time protect county roads.

Commission staff also reviewed the permit application and determined a coastal development permit would be required from the Commission. Commission staff anticipated the County would ask for an emergency permit to breach the sandbar while its application for the five-year permit was pending. Prior to issuing any emergency permits, "a consensus was quickly reached" among staff from the Commission, the Department, the County, and DWR that no significant flooding problems occurred when the lake's elevation was kept below six feet msl. Based on that agreement, the Commission in 1987 "resolved the agricultural/natural resource conflicts in favor of protecting the natural resources," and it issued a two-year permit conditioned on

---

An internal Commission staff memo from 1981 criticized the County's draft land use plan for designating Pacific Shores for urban residential use. The designation had the effect of boosting the lots' market value while state acquisition was imminent. It also was incompatible with what the land was; a dune land resource. Staff recommended the land use plan designate Pacific Shores as a natural resource. Staff did not intend to support Pacific Shores development.

breaching the sandbar at six feet msl and only between October and April. From the expiration of this permit until 2005, and except for a two-year interim permit issued in 1999, all further breaching of the sandbar occurred pursuant to emergency permits issued by the Commission upon a showing of urgent need.

In 1990, the Department for the first time sought to control breaching at the sandbar. It joined with the County in applying to the Commission and the Army Corps for new five-year permits to breach the sandbar at six feet msl. The Pacific Shores Water District opposed the application to the Commission. It contended the water level then being maintained (six feet msl) kept a 168-acre parcel owned by the Owners Association under water and flooded septic tanks owned by other lakeshore residents. Instead of seeking any kind of Commission approval, the Pacific Shores Water District asked the Commission to vest regulatory control of the breaching with the County.

The Department thereafter asked to continue the hearing on its application for about one year. The Commission agreed, but when it did so, Commission staff directed the Department to address the project opponents' concerns that the proposed breaching at six feet msl constituted a taking. Three months later, in January 1991, the Department withdrew its permit application to the Commission. That week, the Commission approved an emergency permit to breach the sandbar at 8.6 feet msl.

Meanwhile, the Department had not yet withdrawn its application for a permit from the Army Corps. The Army Corps had preliminarily determined, among other matters, that breaching at six feet msl would benefit endangered Aleutian Canada geese by providing them more feeding areas. The geese apparently fed along grasslands and pastures above the six feet msl line.

Reviewing the Department's application to the Army Corps, the USFWS expressed serious concern about breaching the sandbar at six feet msl. Breaching at that level would reduce the lake's area and depth from its natural condition, adversely affecting principal habitats for waterfowl and juvenile salmonids. The USFWS also

12

noted there was no longer any concern for protecting Aleutian Canada geese feeding areas above six feet msl, as the species' entire population in the area no longer used the lake for foraging. The USFWS also wanted no manual breaching until there were sufficient studies documenting the environmental effects of breaching.

The Department thereafter withdrew its permit application from the Army Corps. The County, however, did not have the time or money to perform the studies the USFWS requested. If there was no manual breaching, the sandbar would not breach naturally until water levels reached 12 feet msl. At that level, water would flood Lower Lake Road, a county road running north of the lake, by two feet and would inundate 1,000 acres of land and many residences.

The County thus applied to the Army Corps for a two-year permit to breach the sandbar at eight feet msl between September and February, and to breach it again if, on February 15, the lake was at five feet msl. The County determined that if it breached the sandbar at that level, there was "almost zero probability" the lake would flood Lower Lake Road. Also, recognizing the Army Corps' and Commission's regulatory control over wetlands such as the lake, the County stated it was requesting permits to breach at eight feet msl only to avoid flooding on Lower Lake Road. It disclaimed responsibility "for other issues and concerns." The County applied for a similar permit from the Commission.

The Commission in early 1992 granted the County a two-year permit to breach the lake during the rainy seasons, but to do so at *four* feet msl instead of eight feet msl, provided the County obtain an approved permit or lease from the SLC for the breaching site and a permit or letter of permission from the Army Corps. In the absence of additional hydrological and biological studies (DWR's hydrological study had not been completed), the Commission could not find that breaching the sandbar when the lake was at eight feet msl was consistent with the Coastal Act.

13

The County was not able to obtain the needed approvals from the SLC and the Army Corps. The Army Corps determined that it, like the Commission, lacked sufficient environmental analysis. It informed the County it needed to prepare an environmental impact assessment (EIS) under NEPA for the project.

Also, the Department opposed breaching the sandbar when the lake level was at four feet msl. After the Commission granted the permit to breach at four feet msl, the Department withdrew its permission from the County to breach at four feet msl. Meanwhile, the Commission issued emergency permits in February 1992, January 1993, and February 1994 to breach at eight feet msl.

In 1994, the SLC and the Department amended their lease of the breaching site. In the lease, the Department proposed, and the SLC agreed, that the Department could breach the sandbar only between September and February if the lake level rose above eight feet msl, and on February 15 if the lake was above five feet msl on that date. The lease authorized the Department to conduct this "interim annual breaching" pending completion of an EIS and/or an environmental impact report (EIR) under CEQA to determine whether breaching was in the public interest.

Later in 1994, the Department and the County applied to the Army Corps and the Commission for two-year permits to breach the sandbar when the lake rose to eight feet msl between September and February, and on February 15 if lake levels were above five feet msl. This project application was not intended to establish the ultimate management level of the lake, but was intended to authorize breaching for two years pending completion of environmental studies. The Department and the County anticipated submitting permit applications at the end of two years for a long-term breaching program.

In 1995, Commission staff expressed concern that the Department had been unable up to that time to provide it with the necessary environmental information to evaluate the application. It had not received enough information to justify the Department returning to the Commission with a request to breach the sandbar at a height above four feet msl.

14

Commission staff also expressed concern over continually issuing emergency permits while applications for long-term permits were withdrawn due to lack of environmental information. Staff felt this ongoing process "undermines the due process rights of the Coastal Commission and the public as they don't have an opportunity to review and comment on either the emergency permit or the proposed permit in a public setting." The Commission nonetheless issued emergency permits in January and December 1995 and December 1996 to breach at eight feet msl.

In 1997, the Department withdrew its application for the Commission permit. It stated it was working with the County, a working group of interested parties, and the Pacific Shores Water District to obtain information the Commission had requested about how the lake functioned as a coastal lagoon and the environmental impacts from breaching, and it needed additional time. It anticipated reapplying at a later date for a new development permit.

After withdrawing its permit application, however, the Department informed plaintiffs and the working group it would not resubmit an application for any type of breaching permit. The Department stated that as lessee of the breaching site, it would deny access to any permittee who intended to breach at a level less than eight feet msl. It stated any further breaching would have to be done by emergency permit.

In December 1997, the Commission issued another emergency permit to breach the sandbar, as lake levels had reached 8.9 feet msl and flooding had occurred.

In 1998, and despite the Department's earlier announcement, the County and the Department again applied to the Commission for a two-year permit to breach the sandbar at eight feet msl. As with the earlier permit application, the County and the Department viewed this permit as an "interim" permit. The Army Corps was at that time conducting a study of Lake Earl's biological resources and hydrology. The County and the Department intended to operate under the two-year permit while the Army Corps completed its study. After that time, the County and the Department intended to apply

15

for a long-term permit and develop a habitat management plan based on the results of the Army Corps' study.

While the application was pending, the Commission issued two additional emergency permits to breach the sandbar at the nine-foot msl level; one in 1998 and a second in February 1999.

In May 1999, the Commission granted the two-year interim permit. It was to be used pending completion by the Corps of its studies. Under this permit, the County breached the sandbar once, in December 1999.

In November 2000, the Department informed the Commission it had begun revising and updating its management plan for the Lake Earl Wildlife Area. It stated it would prepare an environmental analysis for that project, and part of its analysis would review breaching the sandbar at Lake Earl at various water levels. After this process was complete, the Department and the County anticipated reapplying for a "long-term breaching permit" in 2003. In the meantime, it applied for a three-year permit based on the same terms as the previous emergency permits.

Pursuant to Commission instruction, Commission staff suspended processing the application. The Commission had earlier instructed staff not to accept for filing any application for an additional interim breaching permit until a management plan and an environmental analysis had been completed for the Lake Earl Wildlife Area.

The Commission granted additional emergency permits in late 2000, 2001, two in 2002, and one in 2003. The County sought the 2003 emergency permit because heavy rain had raised the lake level to 10.45 feet msl. Kellogg Road, the only access road into the Pacific Shores subdivision, was flooded to a depth of 15 inches. Lower Lake Road, the only access to Kellogg Road, was flooded to a depth of three inches.

In 2003, the Department prepared the Lake Earl Management Plan (the Management Plan), a long-term plan for managing Lake Earl. The Department also released a draft EIR analyzing the Management Plan's environmental impacts. The

16

Management Plan called for breaching the sandbar when Lake Earl's water level rose to between eight and 10 feet msl between September 1 and February 15, and if the level exceeded five feet msl on February 15.

The EIR evaluated two alternative breaching levels: (1) four to six feet msl; and (2) allowing the sandbar to breach naturally at 12 to 14 feet msl. The Department concluded in the EIR that breaching at four feet msl would reduce habitat, an adverse environmental impact that could not be avoided or mitigated. Breaching at four feet msl would also adversely affect the amount of available wetlands and the wildlife that depended on those wetlands. The EIR concluded that continuing to breach when the lake reached eight to 10 feet msl was the environmentally superior alternative "because it represents a balance between adverse effects on resources under the Department's trusteeship and adverse effects on other land uses in the lagoon vicinity."[5]

The Department certified the final EIR in December 2004 and approved the Management Plan in 2005. It then applied to the Commission for a five-year coastal development permit, and to the Army Corps for a 10-year permit, to breach the sandbar at the eight to 10 feet msl level in the fall and winter, and on February 15 if the lake level was at five feet msl. The Commission and the Army Corps approved the permits in 2005.

PROCEDURAL HISTORY

Plaintiffs filed this action for inverse condemnation in April 2007.[6] In their fourth amended complaint, plaintiffs alleged they represented a class of private owners of

---

[5]     Meanwhile, the Commission granted the Department and the County another emergency breaching permit in February 2004. This permit stated the Commission considered the breaching to be "temporary" work done in an emergency situation. If the Department and the County wanted to have the emergency work become permanent, it had to obtain a development permit from the Commission.

[6]     Plaintiffs earlier filed actions in state and federal court against the Department, the County, the SLC, and the Army Corps. In the state action, plaintiffs challenged the adequacy of the EIR and alleged the Department's actions caused a permanent taking of

17

Pacific Shores lots. The action named the Department; the Commission; the SLC; and the California Wildlife Conservation Board (Conservation Board), the Department's purchasing agent, as defendants, and alleged their actions constituted both a physical taking and a regulatory taking.

In 2010, the trial court granted summary judgment in favor of the SLC and the Conservation Board, and the matter went to trial in 2011 against the Department and the Commission. Evidence at trial indicated Lake Earl flooded for a significant period of time in 2009. Lake levels exceeded nine feet msl from March 20, 2009, until July 1, 2009. During that time period, lake levels exceeded 10 feet msl on May 15 and 16. Photos from March and May of 2009 show flooded roads, including Kellogg Road, the only access road to Pacific Shores.

In the liability phase, the trial court determined the Department and the Commission were liable for a physical taking or damaging of plaintiffs' properties. However, it ruled they were not liable for a regulatory taking because plaintiffs had wrongly sought relief in inverse condemnation instead of administrative mandamus. The court also determined the statute of limitations did not bar plaintiffs' claims, but plaintiffs were not entitled to precondemnation damages.

After the damages trial, the jury awarded the lot owners $10,500 for each of the eight interior lots at issue and $30,500 for the one ocean-fronting lot, for a total of $114,500. The court later awarded plaintiffs their attorney fees ($45,800) and costs ($29,727.28).

---

their property. The trial court ruled in favor of the Department on the EIR, and plaintiffs dismissed their taking claims without prejudice. In the federal action, plaintiffs alleged the Army Corps issued the 2005 permit in violation of the federal Endangered Species Act. The district court upheld the Army Corps' permit except its reliance on part of the incidental take statement issued by the USFWS. (*Pacific Shores Subdivision California Water Dist. v. U.S. Army Corps of Engineers* (D.D.C. 2008) 538 F.Supp.2d 242.)

DISCUSSION

The State appeals and contends the judgment should be reversed because: (1) plaintiffs' claim for inverse condemnation is barred by the statute of limitations; (2) the State is not liable for the natural flooding of plaintiffs' properties as it had no duty to protect against that risk; and (3) the State is not liable because its decision not to breach below eight to 10 feet msl was reasonable. If we affirm the judgment, the State asks us to modify the judgment to award it a permanent flowage easement.

Plaintiffs also appeal and contend the trial court erred by: (1) barring their claims for regulatory taking; (2) disallowing precondemnation damages; and (3) awarding approximately $45,000 in attorney fees when plaintiffs requested over $550,000, a calculation based on the hours their attorneys worked at allegedly reasonable rates. We address the parties' arguments in turn.[7]

I

*The State's Appeal*

A. *Statute of limitations*

The State contends the trial court erred by concluding plaintiffs' claims for inverse condemnation were not barred by the applicable statutes of limitations. We conclude the trial court erred in part. Plaintiffs' claim against the Department was not time barred, as the court ruled, but the claim against the Commission was time barred. We thus reverse the judgment against the Commission, but affirm the court's finding of timeliness against the Department.

---

[7] We also received an amicus brief in support of the State filed by Earl McGrew, Maxine Curtis, Lynda Schoonover, Nicole Solovskoy, and Northcoast Environmental Center.

19

1. *Claim against the Commission*

An aggrieved person has a right to judicial review of any "decision or action" taken by the Commission so long as he files a petition for writ of administrative mandate within 60 days after the "decision or action" becomes final. (Pub. Resources Code, § 30801; *Serra Canyon Co. v. California Coastal Com.* (2004) 120 Cal.App.4th 663, 668, fn. 1.)

There is no evidence plaintiffs filed a writ petition challenging the Commission's 2005 permit or any other decision or action within 60 days after that permit, decision, or action became final. Plaintiffs' failure to do so bars their claim for inverse condemnation against the Commission. " '[R]equiring that an inverse condemnation claim be joined with an administrative mandate action filed within 60 days after the Commission decision becomes final serves the salutary purpose of promptly alerting the Commission that its decision is being questioned and that the State may be liable for inverse condemnation damages.' [Citation.] Once the Commission's permit decision becomes final, the affected property owner is estopped from relitigating the validity of the decision in a subsequent inverse condemnation action. [Citation.]" (*Serra Canyon Co. v. California Coastal Com., supra,* 120 Cal.App.4th at p. 670.)

Plaintiffs contend the 60-day statute and the requirement to file first a petition for writ of mandate do not apply in this instance because the Commission's actions constituted a physical taking. We disagree, as there is no evidence the Commission physically invaded or damaged plaintiffs' properties. Plaintiffs argue the Commission physically took their property interests by "abett[ing] [the Department's] flooding agenda from the early 1990s, facilitating the 'emergency' breaching regime through 2005." These statements admit the Commission's actions were limited to denying and issuing various permits, not physically damaging or occupying plaintiffs' property interests. Accordingly, the 60-day statute applied to plaintiffs' claims of inverse condemnation

20

against the Commission. Because plaintiffs failed to file a petition for writ of mandate within 60 days, their claim against the Commission for a physical taking is barred.

2.  *Claim against the Department*

We turn now to the statute of limitations governing plaintiffs' inverse condemnation action against the Department, a more complex issue. Normally, the determination of when a plaintiff's cause of action accrues is a question of fact we review on appeal for substantial supporting evidence. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487; *Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 281 [accrual of inverse condemnation claim].) However, where the underlying facts are not in dispute or susceptible of more than one legitimate inference, the question of when a cause of action accrues is a question of law, subject to independent review. (*Ibid.; Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1484 (*Bookout*) [accrual of inverse condemnation claim]; *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.* (2004) 116 Cal.App.4th 1375, 1388.) The underlying facts in this case are not in dispute. We thus review the trial court's ruling independently.

Claims for damage to real property must be filed within three years after the cause of action accrues. (Code Civ. Proc., § 338, subd. (j).) A claim for inverse condemnation based on an ongoing taking by flooding is subject to a unique rule of accrual. A property owner's cause of action does not accrue and the statute of limitations period "does not begin to run until the situation has *stabilized*." (*Lee v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 848, 857 (*Lee*), original italics.)

This rule originated in *United States v. Dickinson* (1947) 331 U.S. 745 [91 L.Ed. 1789] (*Dickinson*), where the Supreme Court held inverse condemnation claims against the federal government for a continuous taking by flooding – in that case, damages from flooding caused by higher water levels behind a new dam – do not accrue "until the situation becomes stabilized." (*Id*. at p. 749.) The Supreme Court stated the owner may

21

wait until "the consequences of inundation have so manifested themselves that a final account may be struck." (*Ibid*.)

California has adopted *Dickinson*'s stabilization rule. (*Pierpont Inn, Inc. v. State of California* (1969) 70 Cal.2d 282, 293 (*Pierpont Inn*), disapproved on another ground in *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 708.) "[W]hen the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" (*Pierpont Inn, supra,* 70 Cal.2d at p. 293.)

Plaintiffs filed this action on April 6, 2007. The trial court ruled plaintiffs filed their action within three years of their claims' accrual. Citing *Dickinson* and *Lee*, the court held plaintiffs' claims were not barred by the statute of limitations because the Department's actions were not stabilized until the Department adopted the Management Plan in 2005 and "subsequent resulting flooding" of plaintiffs' lands became certain.

The Department contends the trial court erred. It asserts plaintiffs' claims stabilized long before 2005. Plaintiffs knew the Department had allowed Lake Earl to rise above eight feet msl nearly every year since 1987, and they had complained to the Department and the Commission about property damage from those actions prior to 2001. The Department argues these facts demonstrate as a matter of law plaintiffs' action accrued more than three years before they filed their complaint.

We disagree, and we affirm the trial court's conclusion that plaintiffs' claims against the Department stabilized no sooner than 2005.

Published California opinions have applied the stabilization doctrine to different facts, but they have not set forth a test for applying the doctrine. In *Pierpont Inn*, the Supreme Court stated it was not called upon to determine when plaintiff's action accrued; it was sufficient to hold plaintiff's tort claim, filed more than two years (the limitations period) after the government began constructing a freeway over plaintiff's land but before

workers completed the portion of the project that took his property, was not untimely. (*Pierpont Inn, supra,* 70 Cal.2d at pp. 293-294.)

In *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810 (*Stonewall*), the Court of Appeal held a landowner's claim for erosion caused by a public storm drain was not barred where the owner filed the claim under a one-year claims statute, 11 years after the storm drain's construction but four years before a mudslide triggered by the drain destroyed the owner's property. (*Id*. at pp. 1832, 1843.)

In *Lee*, the Court of Appeal, following *Pierpont Inn* and *Stonewall*, held a plaintiff's cause of action for inverse condemnation had not stabilized when she filed her complaint in 2000, where the transportation authority began constructing subway tunnels in 1993, the construction caused noticeable damage to plaintiff's property beginning in 1995, and her property began settling in 1997. (*Lee, supra,* 107 Cal.App.4th at pp. 851-852, 858.)

Unlike California case law, federal takings jurisprudence has established a test for applying the *Dickinson* stabilization doctrine. The test is sound, and we apply it here. Under federal takings law, an inverse condemnation claim for an ongoing taking stabilizes "when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined. Thus, during the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue, but once it is clear that [1] the process has resulted in a permanent taking and [2] the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run." (*Boling v. United States* (Fed.Cir. 2000) 220 F.3d 1365, 1370-1371 (*Boling*).)

*Boling* clarified *Dickinson's* stabilization doctrine. In *Boling*, the plaintiffs sued the government for ongoing erosion to their coastal properties caused by man-made canals constructed decades earlier to form a contiguous Atlantic Intracoastal Waterway.

23

The Court of Federal Claims ruled the takings claims accrued once any portion of a parcel had suffered erosion damage. (*Boling, supra,* 220 F.3d at pp. 1368-1369.) Plaintiffs on appeal argued stabilization did not occur until their parcels had been completely eroded. The Federal Circuit Court of Appeals rejected both theories. As to the plaintiffs' theory, the court wrote: "Properly understood, stabilization as discussed in *Dickinson* is not deferred until the progressive environmental damage stops, but occurs when the environmental forces have substantially and permanently invaded the private property such that the permanent nature of the taking is evident and the extent of the damage is reasonably foreseeable." (*Id*. at p. 1371.)

The Federal Circuit also rejected the Court of Federal Claims' stabilization test as too rigid an application of the stabilization doctrine. (*Boling, supra,* 220 F.3d at p. 1372.) "[T]he touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." (*Ibid*.) The appellate court noted this point would vary from parcel to parcel. On remand, it directed the trial court to take into account all the factual circumstances that would affect when the permanent nature of the taking became evident such that the landowner should have known his property had suffered erosion damage. (*Id*. at pp. 1372-1373.)

Subsequent federal cases have applied this standard and illuminate for us its operation. *Banks v. United States* (Fed.Cir. 2003) 314 F.3d 1304 (*Banks II*) concerned the effect jetties in Lake Michigan had on down-shore properties. The Army Corps completed construction of the jetties in 1903 and improved them between 1950 and 1989. The presence of the jetties significantly increased the annual rate of shoreline erosion. The Army Corps acknowledged this long-standing problem since at least the mid 1970's. (*Id*. at p. 1306.) To mitigate the problem, the Army Corps regularly filled the beaches with fine sand. After 15 years of doing this, it determined the fine sand did not hold the beaches well. It then deposited coarse material on the shoreline between 1986 and 1993.

In 1995, it expanded its efforts to include placing barge-loads of large rock into the lake. (*Id*. at pp. 1306-1307.) The Army Corps' reports in 1996, 1997, and 1999 (made public in 2000) noted that despite limited success from their efforts, the erosion was irreversible and potentially permanent. (*Id*. at p. 1307.) Affected landowners sued the Army Corps in 1999 for a taking. (*Id*. at p. 1306.)

The Federal Circuit Court of Appeals ruled the statute of limitations did not bar plaintiffs' complaints.[8] While the mitigation efforts were underway, and were changed when not successful, plaintiffs' claims remained uncertain until the Army Corps' reported in 1996, 1997, and 1999 that the erosion was permanent. Plaintiffs' claims did not accrue until 2000, when the Army Corps' reports "collectively indicated that the erosion was permanent and irreversible." (*Banks II, supra,* 314 F.3d at p. 1310.) " '[A] claim stabilizes when the "permanent nature" of the taking is evident.' " (*Id.* at p. 1309, quoting *Fallini v. United States* (Fed.Cir. 1995) 56 F.3d 1378, 1382.) Any promises by the government to mitigate damages caused by a continuous physical process delays a property owner's takings claim when the owner demonstrates that " 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain by the [government's] mitigation efforts." (*Banks II, supra,* 314 F.3d at p. 1309, quoting *Applegate v. United States* (Fed.Cir. 1994) 25 F.3d 1579, 1583.)

*Northwest Louisiana Fish & Game Preserve Com. v. United States* (Fed.Cir. 2006) 446 F.3d 1285 (*Northwest Louisiana*) also found a federal complaint for an ongoing taking was not time barred. The case concerned a state commission that managed a game preserve. The state commission controlled aquatic weeds in a preserve lake by drawing down the lake into the Red River. Meanwhile, federal law obligated the Army Corps to assure navigation on the Red River. The Army Corps did this by

---

[8]     The Tucker Act allows plaintiffs to sue the federal government for a taking, subject to a six-year statute of limitations. (28 U.S.C. §§ 1491, 2501.)

constructing a series of locks and dams on the river. (*Id*. at p. 1286.) In 1988, it began constructing a lock that would impound water at 95 feet msl, 4.5 feet lower than the lake's ordinary elevation. This impoundment limited the lake's drawdown capability to between 3.5 and 6.5 feet less than the state commission required to control the lake's weeds. The state commission asked the Army Corps to seek alternatives to alleviate potential impacts. (*Id*. at p. 1287.) From 1988 through 1994 when the water level reached 95 feet msl, the Army Corps conducted studies and evaluated alternatives to minimize the impacts to the lake. In 1995, an aquatic weed, hydrilla, was rediscovered and spread through the lake. The state commission asked the Army Corps to lower the water level behind the lock to allow it to drawdown the lake. In 1997, the Army Corps denied the request, and it suggested the state commission use herbicides and a limited drawdown. (*Id*. at pp. 1287-1288.)

After filing a state action and an administrative claim, the state commission sued the Army Corps in 2001 for a taking. (*Northwest Louisiana, supra,* 446 F.3d at p. 1288.) The Federal Circuit Court of Appeals ruled the complaint was not barred by the six-year statute of limitations. The state commission's claim accrued under the stabilization doctrine in 1997 after both the appearance of significant hydrilla growth and the Army Corps' first definite refusal to draw down the water level. (*Id*. at pp. 1290-1291.) That was when the commission knew or should have known of the damage and " 'all events which fix[ed] the government's alleged liability [had] occurred.' " (*Id*. at p. 1290, quoting *Boling, supra,* 220 F.3d at p. 1370.)

Applying the *Boling* stabilization test here, we conclude plaintiffs' claims did not accrue under the stabilization doctrine until the completion of the Management Plan in 2005. Although the type of damage that would occur from breaching the sandbar at eight feet msl was known prior to 2005, as the bar had been breached at that level many times, the taking did not become permanent until at least 2005, when the Commission approved the Management Plan and granted the Department a five-year permit to breach at eight to

26

10 feet msl. It was at that time when the Department's desire to breach at eight feet msl obtained a type of permanent approval on which it could act without having to return to the Commission for ad hoc approval until the permit expired. Approving the Management Plan and obtaining the 2005 permit were the events that fixed the Department's liability.

The permit application history supports our determination that plaintiffs' claims did not accrue until 2005. In 1987, the County applied for a five-year permit. After reviewing the permit application, the Commission granted a two-year permit to breach the sandbar at six feet msl between October and April. In 1992, the Commission granted a two-year permit to breach the sandbar during the rainy season at four feet msl, but the Department refused to accept the permit. The Commission would not grant another development permit for breaching until 2005. Instead, it authorized all breaching from 1991 until 2005 under emergency permits and interim permits when flooding was imminent or occurring pending the resolution of various permit applications and environmental reviews.

In 1994, the Department applied for a permit to breach at eight feet msl, but three years later, the Department withdrew its application and told the County it would not apply for another permit. In 1998, the Department and the County applied for a two-year "interim" permit to breach at eight feet msl. In 2000, the Department asked the Commission for a three-year permit pending completion of the Management Plan and its environmental review. The Commission refused to process that application, as the Department had yet to provide it with sufficient environmental analysis.

In the environmental review the Department eventually performed, the Department analyzed breaching the sandbar at eight to 10 feet msl and four to six feet msl as part of determining when it should breach for purposes of the Management Plan. While this review was ongoing, the Commission again granted only emergency permits to breach the sandbar when flooding was imminent or occurring. Finally, in 2004, the

27

Department certified the EIR and in 2005 approved the Management Plan. At that point, the Commission approved a five-year development permit to breach at eight to 10 feet msl. It was not until then that the ongoing process set in motion by the Department to take control of breaching the sandbar – applying for development permits, revoking its permit applications pending additional studies, and operating under emergency permits when the need arose – stabilized and a reasonable person could realize the Department's actions had become permanent. Plaintiffs filed their complaint within three years of that time. These undisputed facts demonstrate plaintiffs' complaint against the Department was not time barred.

The Department argues plaintiffs were aware of the permanent nature of the takings since 1987. Since then, the Department and the Commission allowed the lake level to rise to eight feet msl and higher every year. The Department contends this case is similar to *Bookout, supra,* 186 Cal.App.4th 1478, and *Mildenberger v. United States* (Fed.Cir. 2011) 643 F.3d 938 (*Mildenberger*), two cases where courts held the takings claims were time barred. We disagree with the Department's arguments.

The Department in its briefing ignores the context in which the Department and Commission allowed the lake level to rise to eight feet msl and higher each year. From 1989, the rises all occurred and were abated pursuant to emergency permits, issued without public review and for a one-time breach due to the imminent threat of flooding, or pursuant to interim permits. Both types of permits were issued while applications for development permits to perform the breaching on a long-term basis were either pending or withdrawn. Neither of these types of approval demonstrates the Department's taking had stabilized.

Emergency permits are just that – valid only for an emergency. The Commission's regulations authorize the Commission's executive director to grant an emergency permit to allow development only when an emergency exists that requires action more quickly than could be permitted by the procedures for ordinary Commission

28

permits, and the work is consistent with the Coastal Act. (Cal. Code Regs., tit. 14, § 13009.) All of the emergency permits granted by the Commission from 1991 until 2005 were issued on an ad hoc basis, not as part of a regular or adopted regime. An emergency did not exist and the County could not apply for an emergency permit until the water level exceeded eight feet msl because flooding of roads and property did not begin until the water level exceeded eight feet msl.[9] The authorized breaching levels reflect only the emergency that was happening, not the final decision by the Commission or the County to breach at that level as a matter of policy.

Indeed, by their very terms, emergency permits cannot demonstrate the Department's policy of breaching at eight feet msl had stabilized. The permit stated the Commission considered the breaching to be performed under the permit to be "temporary" work done in an emergency. In this context, when breaching happened only due to an emergency while applications for long-term permits were pending or withdrawn, and when the last development permit approved by the Commission authorized breaching at four feet msl, a person could not reasonably foresee the Department's action of breaching at eight feet msl had become stabilized or permanent.

Interim permits also failed to establish stability. In their applications for an interim permit, the Department admitted the interim permit was needed only while the Department developed a permanent policy for breaching. The Department's policy had not stabilized while it was still formulating the Management Plan and its breaching policy.

---

**9**     For example, in December 1997, the lake's water level rose above 8.9 feet msl. The County board of supervisors declared an emergency, and the Commission granted an emergency permit to breach the sandbar at a water level above 8.9 feet msl for flood control purposes. Similarly, in March 2003, the lake's water level rose to 10.45 feet msl. The board of supervisors declared an emergency, and the Commission granted an emergency permit authorizing breaching the sandbar at a water level above eight feet msl for flood control purposes.

Moreover, when the Department finally performed an EIR, it evaluated breaching at four to six feet msl and not breaching at all as alternatives to breaching at eight to 10 feet msl. Thus, the Department was still considering the possibility of breaching at a water level other than eight feet msl up until 2005. It was not until the Management Plan stating breaching would occur at eight to 10 feet msl was approved and the development permit issued that the Department's actions gained sufficient permanence to put plaintiffs on notice their property rights may have been taken.

*Bookout* and *Mildenberger*, relied upon by the Department, are distinguishable and do not apply here. In *Bookout*, the Court of Appeal, Second Appellate District, Division Six, ruled the three-year statute of limitations barred the plaintiff's action for inverse condemnation. (*Bookout, supra,* 186 Cal.App.4th at p. 1481.) The plaintiff's property suffered intermittent flooding from an inadequate storm drainage system constructed around 1939 and modified around 1977. Plaintiff purchased his property in 2000. Evidence indicated plaintiff complained to the community services district about the flooding every time it rained. He specifically did so in December 2002. He also indicated to the county in June 2002 that his property flooded once a year. (*Id*. at pp. 1481-1482.) The plaintiff filed his complaint for inverse condemnation in May 2006. He testified he discovered the flooding in 2004. (*Bookout, supra,* 186 Cal.App.4th at p. 1482.) The trial court ruled his complaint was time barred. (*Id*. at pp. 1484-1485.)

The *Bookout* plaintiff contended on appeal the stabilization doctrine applied because conditions changed since the 1970's due to maintenance activities, nearby construction, and an accumulation of debris. The Court of Appeal disagreed, holding the damage annually caused by the inadequate storm drain had stabilized. It stated none of the alleged changed conditions compelled the trial court to conclude flooding was not relatively consistent and static (i.e., stable) for several years prior to plaintiff's purchase of his property. (*Bookout, supra,* 186 Cal.App.4th at pp. 1484-1485.) In any event, the evidence supported the trial court's determination that plaintiff knew about the flooding

30

in 2002, inferring his claim could have accrued no later under the circumstances. (*Id*. at pp. 1485-1486.)

In *Bookout*, the defective drain had existed in its condition since the 1970's without significant alteration or review by the state, some 30 years before the plaintiff filed his complaint. Here, the Department began reviewing the propriety of breaching at four feet msl, six feet msl, and eight feet msl in 1991, and did not reach a permanent or stable decision until 2005. *Bookout* is not similar to our case.

In *Mildenberger*, the Federal Circuit Court of Appeals determined the stabilization doctrine did not apply. Again, the case is distinguishable. Plaintiffs in *Mildenberger* contended the Army Corps' management of Lake Okeechobee in Florida resulted in a taking of their riverfront properties. Pursuant to an official management policy, the Army Corps released lake water into a series of connected canals and waterways to manage the lake's water level. It and the state constructed those canals beginning in the late 1800's. The state constructed one, the St. Lucie Canal, in 1924 to connect the St. Lucie River, a brackish river, with the lake. By 1952, it was publicly known that regular releases of fresh lake water through the canal had caused irreparable environmental damage to the St. Lucie River. (*Mildenberger, supra,* 643 F.3d at pp. 941-943.) In the 1990's, some of the plaintiffs published a newsletter that recognized the river was polluted and damaged and had been since construction of the canals and since the 1950's. (*Id*. at p. 946.)

From 2004 through 2006, the Army Corps released high volumes of lake water into the canal. (*Mildenberger, supra,* 643 F.3d at p. 942.) Landowners abutting the St. Lucie River sued in 2006 for a taking of their alleged riparian rights. The Federal Circuit Court of Appeals affirmed the Court of Federal Claims' dismissal of the complaint as barred by the six-year statute of limitations. The court reviewed the 80-year history of discharges by the Army Corps, and concluded the harms to plaintiffs' alleged riparian rights mirrored the harm caused to plaintiffs' rights by the Army Corps in the 1950's.

31

The evidence demonstrated the river's environmental damage was foreseeable and manifested many years before the six years prior to the time plaintiffs filed their complaint. Their claims were barred whether or not the stabilization doctrine applied. (*Mildenberger, supra,* 643 F.3d at pp. 943-946.)

In *Mildenberger*, the Corps' policy of releasing lake water into the canal had been in effect for 80 years without change, and damage to plaintiffs' properties had been known since the 1950's. In both *Mildenberger* and *Bookout*, the governments' actions had stabilized long before the plaintiffs filed their actions.

The holding in *Northwest Louisiana, supra,* 446 F.3d 1285 guides our determination here. In that case, the Army Corps' decision not to lower the water level behind its lock did not become definite until the Army Corps, after years of studying the issue while not lowering the level, formally refused a request by the state to lower the level. Plaintiffs' action accrued at that time as the Army Corps' decision established the permanence of its actions, and plaintiffs timely filed their complaint within six years of the decision. Our case parallels that case.

Because plaintiffs filed their inverse condemnation action within three years of their claims' accrual, their action against the Department is not barred by the statute of limitations.

B.      *Liability for a physical taking*

The Department contends it is not liable in inverse condemnation because it has no duty to provide flood control in the first instance and no duty to provide flood control at a particular level of protection. The Department argues that where it has no duty to provide flood protection, its liability from providing flood protection is limited to those occasions when its improvements make things worse. The Department asserts it cannot be held liable for providing flood protection here where plaintiffs' lands are historically subject to flooding unless its conduct resulted in more water flooding plaintiffs' properties than would have flowed onto their lands without any flood protection. Because, by breaching

32

the sandbar at eight to 10 feet msl – the level approved in the Management Plan – the Department provides more protection against flooding than if the Department did nothing at all, it asserts it cannot be liable in inverse condemnation.

At trial, plaintiffs argued the Department was liable under a theory of strict liability. In its decision, the trial court did not expressly reject the strict liability argument, but it framed the physical taking issue under the reasonableness standard; whether the State caused the damage and whether its actions created an unreasonable risk to property owners. It first found the State's actions caused plaintiffs' damage, and then it determined the State's actions were unreasonable. The causation finding alone was sufficient to establish liability under a theory of strict liability. The court determined plaintiffs suffered damage from a project the Department planned, approved, and operated. "To state a cause of action for inverse condemnation, the plaintiff must allege the defendant substantially participated in the planning, approval, construction, or operation of a public project or improvement which proximately caused injury to plaintiff's property. [Citations.]" (*Wildensten v. East Bay Regional Park Dist.* (1991) 231 Cal.App.3d 976, 979-980 (*Wildensten*).) The trial court cited to *Wildensten* and other strict liability cases, along with cases that applied the reasonableness standard, to support its finding. (See *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 261-262 (*Albers*) [strict liability standard applies except against exercise of police power or where landowner improves his property to defend it against "common enemy" of floodwaters]; *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 602, 610 [damage from water main failure reviewed under strict liability]; *Wildensten, supra,* 231 Cal.App.3d at pp. 979-980 [stating strict liability test for determining inverse condemnation liability for threat of landslide].) Plaintiffs argue we should affirm the judgment under either a theory of strict liability or the reasonableness standard. We affirm both theories.

Our standard of review is mixed. The question of whether to apply a standard of reasonableness or a strict liability standard is a legal issue we review de novo. If the

33

reasonableness standard applies, the question of whether the Department acted reasonably is a fact-based inquiry. We review the trial court's factual findings under the substantial evidence standard. Whether the court properly applied the appropriate legal standard to the facts it found is a question of law. (*Gutierrez v. County of San Bernardino* (2011) 198 Cal.App.4th 831, 844.)

In general, " 'any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable under article I, section [19], of our Constitution, whether foreseeable or not.' " (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 563 (*Belair*), citing *Albers, supra,* at pp. 261-262.) This strict liability test "was later restated in terms of ' " 'substantial' causation" ' so that landowners could establish inverse condemnation liability if the public improvement substantially caused the damage, although the improvement was only one of several concurrent causes. [Citations.]" (*Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 440 (*Bunch II*).)

"As the *Albers* opinion carefully made clear, its general rule of compensability did not derive from statutory or common law tort doctrine, but instead rested on the construction, 'as a matter of interpretation and policy' ([*Albers, supra,*] 62 Cal.2d at p. 262), of our constitutional provision. The relevant 'policy' basis of article I, section 14 [now section 19], was succinctly defined in *Clement v. State Reclamation Board* (1950) 35 Cal.2d 628, 642 . . . : 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' In other words, the underlying purpose of our constitutional provision in inverse – as well as ordinary – condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements' [citation]: 'to socialize the burden . . . – to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society' [citation]." (*Holtz v. Superior Court* (1970) 3 Cal.3d 296, 303.)

34

An exception to this rule of strict liability exists for most flood control improvements. A rule of reasonableness generally applies when upstream alterations or improvements to protect against flooding fail and cause damage to private property. This is so whether the improvements are to a natural watercourse, discharge increased surface water into a natural watercourse, or divert water away from a potentially dangerous natural flow. (*Belair, supra,* 47 Cal.3d at p. 565 [levee failure that increased natural flow]; *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 337 (*Locklin*) [increase of surface water into natural watercourse caused by upstream development by public agency]; *Bunch II, supra,* 15 Cal.4th at p. 439 [failure of flood control improvements designed to divert flood waters out of natural watercourse].)

For these flood control projects, "the public agency is liable if its conduct poses an unreasonable risk of harm to the plaintiff, the unreasonable conduct is a substantial cause of the damage to the plaintiff's property, and the plaintiff has taken reasonable measures to protect his property. The rule of strict liability generally followed in inverse condemnation does not apply in this context. (*Locklin, supra,* 7 Cal.4th at pp. 367, 337-338; see *id.* at p. 378 (conc. opn. of Mosk, J.).)" (*Hauselt v. County of Butte* (2009) 172 Cal.App.4th 550, 557 (*Hauselt*).)

However, the existence of the reasonableness standard of liability does not preclude the strict liability standard from applying in all flood and flood control contexts. A public agency's intentional diversion of water from one location to flood another location may trigger strict liability. "We do not wish to be understood, of course, as suggesting that *intentional* diversions of water *to* a particular place cannot give rise to inverse condemnation liability or that establishing that liability in such a case would require an inquiry into the reasonableness of the public agency's conduct. Such a diversion would result in intentional physical damage to property and would almost always give rise to governmental liability as a matter of course." (*Bunch v. Coachella Valley Water Dist.* (1989) 214 Cal.App.3d 203, 214, fn. 8 (*Bunch I*), original italics.)

35

Our court recognized this distinction in *Akins v. State of California* (1998) 61 Cal.App.4th 1 (*Akins*).  There, a public agency developed a flood control system that in times of flooding intentionally diverted water to flood private property not historically subject to flooding in order to protect other property.  (*Id.* at p. 33.)  We found the agency liable under a rule of strict liability.  We distinguished this situation from that in *Belair* and *Bunch II:*  "On the one hand is the type of situation where a public entity tries to protect private property owners from a risk created by nature and in doing so may alter the risks created by nature, but the public entity's efforts fail.  On the other hand is a situation where government appropriates private property in order to protect other property, creating a risk which would not otherwise exist.  We see no unfairness in applying a reasonableness standard to the first situation but not to the second."  (*Akins, supra,* at p. 33.)

Strict liability may also apply where the government's actions permanently damage property or subject it to frequent and inevitable damage.  "[I]f the government, by works it constructs on its own property or elsewhere, diverts or dams natural waters, thereby *permanently* submerging previously dry private land in order to provide benefits to the public at large, a compensable direct 'taking' of the submerged land may occur no matter how 'reasonable' the government's conduct.  Moreover, cases under the federal Constitution have held that a 'taking' may occur when a government dam or flood control project subjects certain previously dry lands to inundation that is less than permanent, but is frequent and inevitably recurring.  (*Barnes v. United States* (1976) 538 F.2d 865, 870 [210 Ct.Cl. 467], and cases cited.)"  (*Bunch II, supra,* 15 Cal.4th at p. 437, fn. 1, original italics.)

Similarly, damages caused by failure of a water delivery system do not resemble damages caused by failure of a flood control system, and they are judicially reviewed under the rule of strict liability.  "Unlike flood control improvements, the purpose of a water delivery system is not to protect against the very injury that its failure caused.

36

Unlike flood control improvements, failure of the pipe here subjected [plaintiff's] facility to injury from flooding that was not a risk it was exposed to in the absence of the pipe. Thus, the private landowner damaged by failure of the pipe, if left uncompensated, is forced to contribute a disproportionate share of the public undertaking." (*Pacific Bell v. City of San Diego, supra,* 81 Cal.App.4th at pp. 614-615, fn. omitted.)

Thus, our first issue is to determine whether strict liability applies to the Department's actions. Under the unique set of facts we face, we conclude it does.

1.      *Strict liability*

First, we conclude strict liability applies because the Department's decision to breach the sandbar at eight to 10 feet msl was a decision to flood plaintiffs' lands intentionally whenever needed to protect environmental resources. Although plaintiffs' properties were historically subject to flooding, and there were years when the sandbar was not breached at four feet msl, the sandbar was nonetheless regularly breached by hand or machine for more than 100 years to prevent flooding. By its actions, the Department chose to lessen the flood protection the County had provided for decades and to flood plaintiffs' lands.

This is not a case of an agency simply altering risks to land historically subject to flooding should a flood control project fail. (See *Bunch II, supra,* 15 Cal.4th at p. 450.) This is a case where the agency intentionally ensures private property will be flooded by reducing the level of flood protection that had been historically provided, and doing so for purposes other than flood control. This intention to flood plaintiffs' properties resembles in many respects the types of projects foreseen by the court opinions discussed above where agencies intentionally divert water to a location to protect other property.

There is no doubt the Department intended to flood plaintiffs' properties. The EIR showed the Management Plan was designed to decrease the level of flood protection from what had been provided historically, and that doing so would intentionally damage private property. According to the EIR, if the sandbar is breached at four feet msl, as

37

historically had been done, 0.2 acres of Pacific Shores will be inundated, with none of its roads affected. If the sandbar is breached at eight feet msl, as approved by the Department, 40 acres of Pacific Shores and 763 feet of county roads within the subdivision will be inundated.

In fact, the EIR admits the damage will be greater than that. The EIR states the proposal to breach at eight feet msl actually means that a range of water surface elevations could be possible, from well below eight feet msl most of the time to elevations reaching 10 feet or more msl. According to the EIR, if the lake level rises to 10 feet msl, 150 acres of Pacific Shores along with 17,436 feet of roads within the subdivision will be inundated. This is the activity the Department intentionally undertook when it decided to breach the sandbar at eight to 10 feet msl.

Second, we conclude strict liability applies because the project was not a flood control project. The project – breaching at eight to 10 feet msl – will operate not primarily to protect against flooding, but to protect environmental resources at the expense of plaintiffs' property rights. It certainly will not operate to protect plaintiffs' lands from flooding.

The Department mischaracterizes its breaching at eight to 10 feet msl as a flood control project. Since 1987, when the Department began expressing concerns about the breaching, it did so on the basis of protecting the environment, not protecting against floods. Its 1987 comments to the Army Corps on the County's application for a five-year breaching permit opposed breaching at four feet msl because at that level, "the fish and wildlife values of the lake are severely impacted." The Department did not intend the lake to rise above 10 feet msl, but it believed breaching at four feet msl "has the potential for significant adverse impacts to the environment through losses of wetland-associated fish and wildlife." It is for these reasons the Department proposed raising the breaching level.

38

The standard of reasonableness developed by our Supreme Court for flood control cases was to address liability when a flood control improvement fails unintentionally and causes the very damage it was designed to prevent. (*Bunch II, supra,* 15 Cal.4th at pp. 439, 448, 450-451.) Here, there was no project failure; the project caused the damage it was intended to cause. Because the Department intended to flood plaintiffs' properties and reduce the level of flood protection the County had historically provided plaintiffs, and to do so not for purposes of flood protection, but primarily to protect environmental resources, we conclude strict inverse condemnation liability better addresses the interests involved than a standard of unreasonableness. In short, a standard of reasonableness addresses how the agency protected the public against a historical risk of flooding. It should not apply when the agency intentionally eliminates historical flood protection in order to protect environmental resources and thereby substantially causes the flooding the former protection prevented.

The Department contends it is not strictly liable because under the rulings of *Tri-Chem, Inc. v. Los Angeles County Flood Control Dist.* (1976) 60 Cal.App.3d 306 (*Tri-Chem*) and *Shaeffer v. State of California* (1972) 22 Cal.App.3d 1017 (*Shaeffer*), it is not liable under either a causation theory or a breach of duty theory unless its work to control natural flooding subjects plaintiffs' properties to more flooding than would have occurred absent its work. Our Supreme Court has rejected this theory of liability: "Inverse condemnation liability for failure of flood control projects is not predicated upon proof that the public improvements made a preexisting hazard *worse*. In this respect, defendants' reliance on two Court of Appeal decisions, [*Tri-Chem* and *Shaeffer*], to argue to the contrary is misplaced." (*Belair, supra,* 47 Cal.3d at pp. 561-562, original italics.) *Tri-Chem* and *Shaeffer* concerned incidents where private properties historically subject to flooding were flooded when the flood control projects, operating as designed and constructed to that point, could not handle excess flood water. The agencies were found not liable in inverse condemnation. (*Tri-Chem, supra,* 60 Cal.App.3d at p. 313; *Shaeffer,*

39

*supra,* 22 Cal.App.3d at p. 1020.) In *Akins*, we reviewed *Tri-Chem* and *Shaeffer* and concluded liability did not exist in those cases because the evidence "disclosed the flooding occurred in spite of, not because of, the flood control improvements." (*Akins, supra,* 61 Cal.App.4th at p. 47.)

This case, however, does not concern a flood control project exceeding its capacity and flooding occurring in spite of the flood control project. This is a case of a project designed to flood private property; the flooding occurred substantially because of the project. In *Akins*, we stated that if the plaintiffs' properties were historically subject to flooding, plaintiffs must show the agency's conduct in designing a flood control system that flooded their lands intentionally to protect other property was unreasonable. (*Akins, supra,* 61 Cal.App.4th at p. 34.) This was consistent with the policy reasons supporting the standard of reasonableness as applied to flood control projects. When a public agency constructs a flood control project to protect lands historically subject to flooding, the agency "must not be made the absolute insurer of those lands provided protection." (*Belair, supra,* 47 Cal.3d at p. 565.)

That policy carries little weight here where the agency chose to reduce the level of flood protection and intentionally flood lands that had been protected against historic natural flooding in order to protect environmental resources. The Department was not acting as an insurer against risk when it chose to flood plaintiffs' lands. Rather, it was exercising its eminent domain authority by intentionally damaging private property in perpetuity for a public use unrelated to flood protection. Thus, the fact that plaintiffs' lands were historically subject to natural flooding has little bearing in this instance.

By our conclusion, we do not hold the government has a duty to provide flood control or to do so at any particular level. (See *Tri-Chem, supra,* 60 Cal.App.3d at p. 312; *Shaeffer, supra,* 22 Cal.App.3d at p. 1021.) Rather, we simply hold that under the circumstances of this case, where the government intentionally reduced the level of historic flood control in order to flood plaintiffs' lands for purposes other than flood

40

control, the agency is strictly liable in inverse condemnation for the damage its actions caused. There is no dispute the Department's policy not to breach the sandbar until it reaches eight to 10 feet msl is a substantial cause of plaintiffs' damages. Because the damage to plaintiffs' properties is caused by the breaching project as deliberately designed and constructed, the trial court correctly determined the Department was liable in inverse condemnation.[10]

### 2. *Unreasonableness of Department's actions*

Even if strict liability did not apply, the Department contends it acted reasonably in determining to breach, and actually breaching, the sandbar at eight to 10 feet msl, and thus cannot be liable in inverse condemnation. The trial court rejected this argument and held the Department acted unreasonably. Assuming only for the sake of argument that the breaching is a flood control project subject to the standard of reasonableness, we, too, conclude the Department acted unreasonably and is thus subject to inverse condemnation liability.

As stated earlier, a rule of reasonableness determines a government agency's liability for damage caused by a flood control project that fails. According to this rule, "where the public agency's design, construction or maintenance of a flood control project is shown to have posed an unreasonable risk of harm to the plaintiffs, and such unreasonable design, construction or maintenance constituted a substantial cause of the damages, plaintiffs may recover regardless of the fact that the project's purpose is to contain the 'common enemy' of floodwaters. [Citations.]" (*Belair, supra,* 47 Cal.3d at p. 565.)

---

**10**     Because we decide this case under the standards of strict liability, we need not address the Department's arguments that it had no duty to provide flood control and that the facts did not justify an exception to the no-duty rule.

41

This rule of reasonableness "was deemed to best serve two competing concerns in the flood control context: on the one hand, a public agency that undertakes a flood control project must not be deemed an absolute insurer; on the other hand, the damage potential of a defective public flood control project is clearly enormous. ([*Bunch II, supra,*] 15 Cal.4th [at pp.] 442-443, citing *Belair*[*, supra,* 47 Cal.3d at pp. 565-566].) Reasonableness, in this context, involves a balancing of public need against the gravity of private harm, and aligns with the basis for inverse condemnation liability: when a public agency has acted unreasonably, the damaged property owner should be compensated because the owner has contributed more than his or her proper share to the public undertaking. (*Bunch* [*II*]*, supra,* 15 Cal.4th at p. 443; *Locklin, supra,* 7 Cal.4th at pp. 337, 367-368; see also *Paterno v. State of California* (2003) 113 Cal.App.4th 998, 1003, 1019-1020 [(*Paterno*)].)" (*Hauselt, supra,* 172 Cal.App.4th at p. 557.)

In *Locklin*, the California Supreme Court enumerated factors courts are to consider when determining whether a public agency's design, construction, operation and maintenance of a flood control project were reasonable. (*Locklin, supra,* 7 Cal.4th at pp. 367-369.) The Supreme Court and the Courts of Appeal most often utilize the following six factors: " ' "(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff." ' [Citation.]" (*Biron v. City of Redding* (2014) 225 Cal.App.4th 1264, 1276-1277.) We review the trial court's factual finding that the Department acted unreasonably under the substantial evidence standard, and we determine whether the court correctly applied the appropriate legal standard to the facts properly found as a question of law. (*Id*. at p. 1277.) We find

42

sufficient evidence to support the court's judgment and that the court applied the unreasonableness standard correctly.

### a.      *Project's overall public purpose*

As the Department states in its briefing, its plan to breach the sandbar at eight to 10 feet msl "serves the significant public purpose of protecting important coastal resources, including the lagoon's unique wildlife and wetland values."  We do not dispute the significance of the Department's plan and its responsibility to protect the state's natural resources.  And we acknowledge the project provides some flood protection if lake levels rise above eight to 10 feet msl.  But the project was also designed not to protect plaintiffs' properties from experiencing flooding.

### b.      *The degree to which reciprocal benefits offset plaintiffs' losses*

The Department contends the ecological benefits and the benefits other landowners will enjoy from higher lake levels (increased usability, improved aesthetics) outweigh the minimal losses suffered by the plaintiffs.  The Department asserts plaintiffs' losses were minimal because they had not invested much into their long-vacant lands.  However, this factor focuses on "reciprocal" benefits – those the plaintiffs receive in return.  The Department has not argued, and cannot argue, that plaintiffs receive benefits in return other than those enjoyed by the public at large, but, unlike the public at large, at the cost of access and use of their private property.  Plaintiffs received no offsetting benefit from the flooding.  (*Paterno, supra,* 113 Cal.App.4th at p. 1024.)

### c.      *Availability of feasible alternatives with lower risks*

The Department asserts breaching at eight to 10 feet msl was its preferred alternative because it would best meet all of its objectives for the Management Plan.  The EIR contains the Department's analysis on this issue.  However, the existence of an alternative preferred for environmental purposes does not by itself render other alternatives infeasible for purposes of reducing the risk of damage to private property.

43

There was a feasible alternative that reduced the risk of flooding. At one point, before the EIR was prepared, all of the agencies involved in determining whether breaching should be allowed agreed that breaching at six feet msl fully protected the land owners' interests while also protecting Lake Earl's environmental resources. This alternative was analyzed to some extent in the EIR, as the EIR analyzed the impacts of breaching at four feet msl by focusing on six feet msl for "worst case" analytical purposes.

At no point did the EIR determine breaching at four to six feet msl was infeasible. The EIR found breaching at four to six feet provided environmental benefits, but not as many benefits as breaching at eight to 10 feet msl. Breaching at the former level would result in less lake water volume and water surface and less habitat and wetlands, effects to the current environmental setting that the EIR considered to be significant and immitigable. However, the EIR also found implementing the Management Plan and its management tasks under either alternative would result in similar environmental impacts not unique to one or the other. And the EIR found that breaching at lower lake levels reduced the risk of flooding on plaintiffs' properties. Thus, for purposes of determining the reasonableness of the Department's action for inverse condemnation liability, a feasible alternative existed that would have reduced the risk of flooding.

d.      *Severity of plaintiffs' damage in relation to risk-bearing capabilities*

This factor focuses on what plaintiffs could have done to avoid the risk of damage to their properties. (*Paterno, supra,* 113 Cal.App.4th at p. 1025.) Plaintiffs' undeveloped properties did not suffer large economic losses but plaintiffs also could have done little to avoid the risk of damage. The increased flooding would first affect access to their properties by inundating county roads. Plaintiffs had no control over how county roads could be protected from flooding. Nor could plaintiffs control the breaching after the Department assumed control over that process.

44

The Department contends plaintiffs were on notice of potential flooding when they purchased their properties.  However, the 1963 disclosure statement stated the County had alleviated flooding risk except for the risk of the Smith River overflowing its banks.  Purchasers were not on notice that the Department would eventually cease to allow breaching when the lake rose above four feet msl.

e.  *Whether plaintiffs' damage is a normal risk of land ownership*

The historical need for breaching the sandbar indicates flooding was a normal risk of owning land in Pacific Shores.  Over time, some artificial works can become the natural condition and parties are generally entitled to rely upon them.  (*Paterno, supra,* 113 Cal.App.4th at p. 1026.)  The trial court implicitly found the historical breaching at four feet msl in effect became the natural condition on which plaintiffs relied when they purchased their properties.  Substantial evidence supports this point, even if plaintiffs made no improvements to their lands.  Breaching for agricultural and residential interests at four feet msl continued regularly from the late 1800's.  Plaintiffs relied upon that practice continuing when they acquired their lands, as did the County when it approved the subdivision.  Plaintiffs' lack of further reliance, however, lessens this factor in their favor.

f.  *Distribution of damage to other beneficiaries of the project.*

The flooding damages lots in Pacific Shores that lie at or below 10 feet msl.  As the EIR notes, if breaching occurs when the lake level reaches 10 feet msl, 150 acres of Pacific Shores will flood, leaving roughly 1,350 acres of the subdivision dry.  If flooding cuts off access to the subdivision, which it has in the past, all Pacific Shores property owners suffer.

However, none of the large numbers of the general public the Department claims will benefit from its project and the raising of Lake Earl's water level suffers any of the damage plaintiffs suffer.  In this regard, the Department's project is no different from any other public project by which a government agency obtains possession or control of

45

private property through eminent domain, either directly or by inverse condemnation, for a public purpose and public use. If not compensated in those circumstances, the property owners bear a disproportionate cost of the government's project. So it is here.

In summary, substantial evidence supports the trial court's factual determinations and the trial court correctly determined that the *Locklin* factors, when considered together in this matter, weigh in favor of plaintiffs. The cost of a project designed primarily to protect environmental resources is better absorbed by the public that benefits from the project rather than the landowners who contribute more than their proper share. The trial court did not err in determining that the Department created an unreasonable risk for purposes of inverse condemnation liability.

C.      *Permanent flowage easement*

As we have affirmed the trial court's judgment, the Department asks us to modify the judgment to grant it a permanent flowage easement over plaintiffs' properties. Plaintiffs raise no argument in opposition. We agree with the Department's contention, but we will remand the matter to the trial court to award the easement.

"It is well settled in an inverse condemnation case where there has been found a taking, the public entity acquires an interest in the property in return for the payment of damages. [Citations.]" (*Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 962-963 (*Salton Bay Marina*).) Here, the trial court found there was a taking, and it awarded damages based on "the difference between the fair market value before the taking and after the taking." Where there has been a taking of a property interest but the judgment does not reflect the interest taken, we are authorized to modify the judgment. (*Id*. at p. 964.) However, the trial court is best placed to determine the contours of the easements across plaintiffs' lands at an evidentiary hearing. We will order it to do so.

46

## II

### *Plaintiffs' Appeal*

Plaintiffs contend the trial court erred by: (1) barring the regulatory taking claim due to a failure to seek relief by administrative mandamus instead of inverse condemnation; (2) disallowing precondemnation damages; and (3) awarding insufficient attorney fees. We disagree with each of their contentions.

A. *Regulatory taking*

Plaintiffs contended the Commission committed a regulatory taking by retaining land use permitting jurisdiction over Pacific Shores since 1981 to the present day. Recall that in 1981, the Commission refused to certify the County's proposed residential land use designation for Pacific Shores, and it designated the subdivision an area of deferred certification in the County's local coastal program land use map. This designation resulted in the Commission retaining land use authority over the subdivision unless and until the County submitted a revised land use designation for Pacific Shores and the Commission certified it as consistent with the Coastal Act.

Plaintiffs alleged the Commission, by designating Pacific Shores as a "white hole," essentially established perpetual jurisdiction over Pacific Shores when it allegedly has no authority to retain jurisdiction ad infinitum. Under the trial court's phrasing of plaintiffs' argument, the Commission's placing Pacific Shores in a white hole arguably violated the Coastal Act's dictates for local planning, and it denied plaintiffs the ability to develop their properties due to the lack of a local coastal program and a viable administrative apparatus for that purpose. Plaintiffs also alleged the Commission imposed changing, invalid, or insurmountable conditions on development in the subdivision, and it had denied all prior development permits to third parties.

The trial court ruled plaintiffs' claim of a regulatory taking was barred. It wrote, "[T]he sole appropriate remedy for challenging invalid conditions, or to seek and obtain

47

the governmental entity's compliance with the law and due process as proposed by plaintiffs, is administrative mandamus – not inverse condemnation. [Citations.]" Because its ruling mooted other arguments, the trial court did not address whether plaintiffs had failed to exhaust their administrative remedies or whether the statute of limitations barred their claim, as the State had argued.

Plaintiffs acknowledge California provides them with an adequate process – administrative mandate – for obtaining compensation, and that, in general, one must resort to that process in order to recover for a regulatory taking. California law requires a plaintiff alleging a regulatory taking to "afford the state the opportunity to rescind the ordinance or regulation or to exempt the property from the allegedly invalid development restriction once it has been judicially determined that the proposed application of the ordinance to the property will constitute a compensable taking. The owner may do so, where appropriate, by a facial challenge to the ordinance, but in most cases must seek a variance if that relief is available and then exhaust other administrative and judicial remedies. The facial challenge may be through an action for declaratory relief [citation]. The latter, an 'as applied' challenge to the development restrictions imposed by the administrative agency, may be properly made in a petition for writ of 'administrative' mandamus to review the final administrative decision (Code Civ. Proc., § 1094.5) and that action may be joined with one for inverse condemnation. A declaratory relief action also may be joined with an action in inverse condemnation. [Citation.] Damages for the 'taking' may be sought in an administrative mandamus action (Code Civ. Proc., § 1095), or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action. [Citations.] The owner 'may not, however, elect to sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid.' [Citation.]" (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 13-14, fn. omitted.)

48

There is no dispute plaintiffs did not follow this process. They did not file a petition for administrative mandate. Although two permit applications had been filed with the Commission for a development permit at some time, they were returned to the applicants unprocessed. As a result, the Commission has had no opportunity to apply its permitting standards to a permit application to develop plaintiffs' lands and make a decision from which administrative mandate could be sought. Plaintiffs' claim for an as-applied regulatory taking is unripe.

Plaintiffs, however, assert they were exempt from this process pursuant to the "administrative jurisdiction exception" to the doctrine of exhaustion of remedies. Under this exception, exhaustion of administrative remedies "may be excused when a party claims that 'the agency lacks authority, statutory or otherwise, to resolve the underlying dispute between the parties.' [Citations.]" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1081-1082.)

The administrative jurisdiction exception may apply even though the administrative agency has not yet made a final decision. For example, the court in *California-Nevada Annual Conference etc. v. City and County of San Francisco* (2009) 173 Cal.App.4th 1559, held the exception applied when the owners of a vacant church sued to stop San Francisco from continuing proceedings to designate the church as a historical landmark because, under state statute, churches were exempt from any such process. The court granted the owners relief, even though the city had not made a final decision. The court wrote: "If an agency is proceeding in a matter beyond its jurisdiction, judicial intervention may be obtained even though the agency has not yet reached a final decision and the affected party therefore has not yet exhausted its administrative remedies. [Citation.] Relief may be obtained in such a case even if the unauthorized acts are considered legislative in nature. [Citation.]" (*Id.* at p. 1569.)

49

Plaintiffs contend they fall within the administrative jurisdiction exception because the Commission, by maintaining land use authority indefinitely over Pacific Shores, is proceeding beyond its jurisdiction. They argue the Commission was required to delegate original permitting responsibility to local governments through a local government's adoption of a local coastal program, and that the Commission's "assumption" of local planning authority violates the Coastal Act. We disagree with their contention, as the Commission has not acted, and is not acting, beyond its jurisdiction.

Before plaintiffs may develop their lots, they must obtain a coastal development permit. (Pub. Resources Code, § 30600, subd. (a).) The Coastal Act vests the Commission with land use permitting authority over land in the coastal zone unless and until the local government approves a local coastal program and the Commission certifies that the program complies with the Coastal Act's requirements. (Pub. Resources Code, §§ 30519, subd. (a); 30600, subds. (a), (c), (d).)[11] The Coastal Act requires local governments to prepare local coastal programs and have them certified by the Commission. (Pub. Resources Code, § 30500, subd. (a).) However, until local governments comply with that directive, the Commission retains land use authority. (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 362-363.)

Here, there is no dispute the Commission in 1981 did not certify the portions of the County's local coastal program that would have applied to Pacific Shores. It determined those portions did not comply with the Coastal Act's policies. As a result, Pacific Shores remained an area of deferred certification and would do so until the County prepared the necessary studies and submitted a revised program. The County has never submitted a revised program for Pacific Shores to the Commission.

---

[11] There are alternate methods for a local government to obtain land use authority over land in the coastal zone, but plaintiffs do not allege any of them occurred here. (See Pub. Resources Code, §§ 30600, subds. (b), (d); 30600.5.)

Accordingly, the Coastal Act vests land use jurisdiction for the subdivision in the Commission, and does so until the County acts. Because the Commission is not acting outside its jurisdiction, the administrative jurisdiction exception does not apply, and plaintiffs are not excused from not filing a permit application with the Commission as a prerequisite to bringing a claim for a regulatory taking and then challenging the Commission's decision on that application in administrative mandate. The trial court correctly determined plaintiffs' action for regulatory taking was barred.

B.      *Precondemnation damages*

Plaintiffs contend the Commission's deferring certification of the County's local coastal program for Pacific Shores from 1981 to the present, combined with the increased flooding plaintiffs have experienced, constituted a de facto precondemnation taking: the type of oppressive acts restraining the use of their properties done without formal condemnation for which a landowner must be compensated. (*Klopping v. Whittier* (1972) 8 Cal.3d 39, 51-52 (*Klopping*.) The trial court disagreed with this contention, and so do we.

*Klopping* holds a condemnor may be liable for damages for the adverse economic impact on private property resulting from precondemnation delay and unreasonable conduct. (*Klopping, supra,* 8 Cal.3d at pp. 51-52.) "In order to demonstrate entitlement to damages for unreasonable precondemnation conduct, '. . . a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value.' (*Id.* at p. 52, fn. omitted.)" (*Contra Costa Water Dist. v. Vaquero Farms, Inc.* (1997) 58 Cal.App.4th 883, 896.) A trial court's resolution of this issue is a question of fact we review for substantial evidence. (*Id.* at p. 897.)

51

The trial court's determination that plaintiffs were not entitled to precondemnation damages is supported by substantial evidence. The delay encountered here arose from the County's decision not to submit a revised local coastal program for Pacific Shores. Without that application, the Commission was obligated to retain land use authority over the subdivision. The Commission had no duty to prepare a program for the subdivision or to compel the County to do so. The Commission's statutorily mandated duty to retain land use authority when the County failed to act cannot be grounds for holding the Commission liable for unreasonable delay.

C.    *Attorney fees*

Code of Civil Procedure section 1036 (section 1036) requires a court to award a successful inverse condemnation plaintiff a sum that will reimburse the plaintiff's "reasonable costs," including "reasonable attorney . . . fees actually incurred . . . ." Plaintiffs contend the trial court erred in awarding them $45,800 in attorney fees. They assert the court erred by limiting their fees to what they agreed to pay under a contingency agreement, and instead should have awarded reasonable fees based on the time spent by trial counsel. We disagree.

Plaintiffs submitted billing logs showing the hours trial counsel spent on this case and their billing rates. The total hours at the given rates equaled $556,210 in fees. Plaintiffs sought this amount in fees under section 1036, but they submitted no evidence of what fees they were actually required to pay.

The State introduced into evidence the contingency fee agreement between plaintiffs and their counsel. The agreement set forth the attorney fee requirement as follows: "Attorney's fees are $225 an hour. The amount Attorney will receive for attorney's fees for the legal services to be provided under this agreement will be the greater of [(1)] those fees awarded by the court in a final judgment, or [(2)] the recovery from the settlement or final judgment resulting from the lawsuit, pursuant to the following: [¶] . . . [¶] (c) Forty percent (40) percent [*sic*] of the recovery if any

recovery is obtained after trial . . . .  [¶]  If Clients for any reason decide to drop the suit before settlement or judgment or to discharge Attorney and obtain other counsel before settlement or judgment, compensation will be paid by Clients at Attorney's hourly rate of $225 for each hour expended by Attorney on Clients' case."

The trial court determined the actual attorney fees plaintiffs would incur under the contingency agreement would equal 40 percent of the judgment, and it awarded that amount in fees.  The court relied upon our decision in *Andre v. City of West Sacramento* (2001) 92 Cal.App.4th 532 (*Andre*), where we held section 1036 limited fees to those actually incurred, and that the fees actually incurred set a ceiling for the amount of reasonable fees the court could award.  (*Id*. at p. 537.)  In *Andre*, we reversed the award of reasonable attorney fees and remanded the matter to the trial court.  The plaintiff had submitted declarations showing her attorney's hourly rates and the time spent on the case, but she had not presented evidence showing the actual fees she had incurred.  There was a contingency agreement, but the plaintiff had refused to disclose it.  (*Id*. at pp. 533-534.)

Plaintiffs ask us to limit *Andre* to a situation where there is no evidence of any agreement between counsel and client obliging the client to any actual costs.  They ask us to apply instead the test provided in *Salton Bay Marina, supra,* 172 Cal.App.3d 914. *Salton Bay Marina* held that a contingency agreement is only one factor a trial court may consider when awarding fees under section 1036, and that the court may also consider the amount of time the attorneys spent on the case.  (*Id*. at p. 957.)  We reject plaintiffs' request and adhere to *Andre*.

In *Salton Bay Marina*, the plaintiffs entered into a contingency agreement to pay attorney fees in the amount of 40 percent of the total damages recovered in an inverse condemnation action.  The judgment awarded the plaintiffs roughly $6,960,000 in damages.  (*Salton Bay Marina, supra,* 172 Cal.App.3d at pp. 927, 950.)  The plaintiffs moved for attorney fees under section 1036 of approximately $4,285,500, roughly equivalent to 62 percent of the judgment.  Expert witnesses for the defendant public

53

agency testified a reasonable fee would be approximately $750,000, but conceded contingency fee arrangements were not unusual in this area of law. Based on the plaintiffs' attorneys' listing of hours spent and hourly rates, the public agency argued for a fee award of $241,000, not including time for support services. (*Id*. at p. 951.) If support services were added, the total time spent by attorneys and staff on the plaintiffs' case equaled $444,768. (*Id*. at p. 951, fn. 5.)

The trial court did not rely on the contingency agreement. Instead, it analogized the fee award to the manner in which fees are awarded in probate, and it calculated fees based on a graduated scale. Under this formula, the court awarded approximately $2,984,000 in fees, roughly equivalent to 43 percent of the damages award. (*Salton Bay Marina, supra,* 172 Cal.App.3d at p. 951.)

The public agency defendant challenged the fee award on appeal. It argued a trial court should determine the reasonableness of fee awards under section 1036 as it does in public interest litigation, relying upon such factors as time spent, a reasonable hourly rate, the contingent nature of the case, its complexity, and other factors. Opposing, the plaintiffs contended the court should rely on the actual fee arrangement between the client and the attorney. (*Salton Bay Marina, supra,* 172 Cal.App.3d at p. 952.)

The Court of Appeal for the Fourth Appellate District, Division One, agreed with the public agency defendant and reversed the fee award. (*Salton Bay Marina, supra,* 172 Cal.App.3d at pp. 957-958.) The court wrote: "The language of Code of Civil Procedure section 1036 supports an interpretation attorney fees should be objectively measured. By stating fees must be both reasonable and 'actually incurred,' the Legislature intended to protect the public from both unreasonable fee awards as well as from fee awards that bear no relationship to the amount of attorney time actually incurred in the preparation and trial of the case. This intent is not negated by section 1036's language of reimbursement. Rather, by stating the court should 'reimburse such plaintiff for his . . . reasonable attorney . . . fees,' the Legislature instructed the court should award plaintiff actual

attorney fees he or she incurred *to the extent* the fees are reasonable, e.g., to the extent the number of hours actually expended were reasonably necessary and to the extent the hourly rate actually charged was reasonable; both of these being objective measures." (*Salton Bay Marina, supra,* 172 Cal.App.3d at pp. 954-955, italics added.)

The court stated reasonableness in this context must be viewed from the public's perspective, as the public pays attorney fees in inverse condemnation cases. As a result, the bargaining between a landowner and his attorney to reach a contingency fee agreement was of little value in this context. "If the public entity is bound to the contingent fee agreement, then the client lacks incentive to keep the attorney's share reasonable since the attorney's share will neither come out of the client's recovery nor be paid by the client." (*Salton Bay Marina, supra,* 172 Cal.App.3d at p. 957.) The court concluded the Legislature contemplated an award of attorney fees under section 1036 be "based on the amount of time spent on the case and other factors and not based solely on a contingent fee arrangement between attorney and client." (*Ibid.*) The court reversed the award to the plaintiffs, and remanded for a redetermination of a reasonable award. (*Id.* at pp. 957-958.)

Our court addressed *Salton Bay Marina* in *Andre*. There, the plaintiff won an award of damages against a city for inverse condemnation and negligence. The jury awarded the plaintiff $10,587.50 for the taking. The plaintiff sought an award of attorney fees under section 1036 in the amount of $103,887.50. She submitted declarations outlining her attorneys' hourly rates and the time expended on the case. (*Andre, supra,* 92 Cal.App.4th at p. 534.) The city moved to tax costs, contending section 1036 limited an award of attorney fees to those that were actually incurred. The city showed the plaintiff had not submitted the contingency agreement between her or her attorney, or any other evidence to establish how much she was actually required to pay in attorney fees. (*Ibid.*) In reply, the plaintiff argued the fees she sought were necessary and reasonable.

She stated she had a contingency fee agreement with her attorney, but she refused to disclose it pursuant to the attorney/client privilege. (*Ibid*.)

The trial court expressed concern that the fee request was many times greater than the award of inverse condemnation damages. (*Andre, supra,* 92 Cal.App.4th at p. 534.) However, relying on *Salton Bay Marina*, the trial court concluded the contingency agreement was not the critical factor, and the plaintiff was entitled to reasonable fees. The court awarded $54,017.33 as reasonable attorney fees. (*Id.* at p. 535.)

The city appealed the award, and we reversed. We wrote: "Plaintiff did not introduce any evidence at trial to establish the amount of attorney fees she was obligated to pay. Instead, plaintiff emphasizes her entitlement to 'reasonable' attorney fees. She ignores [section 1036's] second requirement: While the fees must be reasonable, they must also be 'actually incurred.' If plaintiff did not incur $54,107.33 in attorney fees [the amount the trial court awarded], she cannot recover that amount, no matter how 'reasonable' such an award might be in the abstract." (*Andre, supra,* 92 Cal.App.4th at pp. 535-536.)

The plaintiff argued otherwise, relying on *Salton Bay Marina*. She seized on language from that case, quoted above, that the contingency fee agreement was only one factor to consider when awarding attorney fees. We disagreed with her interpretation of the case. "This [argument] ignores the context in which the court's comments were made. In *Salton Bay Marina,* the plaintiff[s] [were] obligated under the terms of its contingency fee agreement for approximately $4 million in attorney fees. The question before the court was whether this amount, which was 'actually incurred,' should be awarded, or whether the court should also consider various factors and determine whether such an award was reasonable.

"Here, in contrast, plaintiff did not introduce evidence to demonstrate the amount of attorney fees actually incurred. The import of *Salton Bay Marina* is clear. To receive an award of fees under section 1036, the court must first determine what fees were

56

actually incurred. It must then assess whether the fees are reasonable. In other words, the fees actually incurred are a ceiling to any fee award; fees may be reduced because they are unreasonable and pose an unnecessary burden on public funds, but they cannot be increased beyond what was 'actually incurred.' " (*Andre, supra,* 92 Cal.App.4th at p. 537.)

Here, we have evidence, in the form of a contingency agreement, of what fees plaintiffs actually incurred. However, plaintiffs also seize on the language in *Salton Bay Marina* to assert a contingency agreement is only one factor to consider when awarding fees under section 1036. Like the plaintiff in *Andre*, plaintiffs here take *Salton Bay Marina* out of context. There, the actual fees incurred had been established, and section 1036 required the court to "award plaintiff actual attorney fees he or she incurred *to the extent* the fees were reasonable . . . ." (*Salton Bay Marina, supra,* 172 Cal.App.3d at p. 955, italics added.) In other words, the trial court was not required to award fees based on the contingency agreement if that amount *exceeded* what a reasonable amount would be. But nowhere did *Salton Bay Marina* suggest a court was free to award more fees than what the plaintiffs had actually incurred pursuant to a contingency agreement.

*Andre* compelled the trial court's decision here. The contingency agreement obligated plaintiffs to pay in attorney fees 40 percent of any recovery awarded after trial. The agreement thus capped the amount of fees the court could award under section 1036 to that amount, and the court awarded the full amount. The court did not err in doing so.

Plaintiffs argue *Salton Bay Marina* stands for the proposition that section 1036 allows fee awards in amounts that *exceed* what was actually incurred by the plaintiff where the contingency award bears no relationship to the amount of attorney time actually incurred in the preparation and trial of the case. That was not the issue in *Salton Bay Marina*; the case is thus not authority for plaintiffs' argument. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 118.)

However, to the extent *Salton Bay Marina* can be read to allow fees under section 1036 in excess of the amount the client actually incurred pursuant to a contingency agreement, we disagree with its reasoning. The appellate court stated the Legislature, by using the words "actually incurred," intended "to protect the public from both unreasonable fee awards as well as from fee awards that bear no relationship to the amount of attorney time actually incurred in the preparation and trial of the case." (*Salton Bay Marina, supra,* 172 Cal.App.3d at p. 954.) If, in making this statement, the appellate court held section 1036 allowed fees in excess of those incurred under a contingency agreement, the court disregarded the clear meaning of fees "actually incurred" and misinterpreted it to mean the amount of attorney *time* reasonably billed. Attorney fees are incurred by the person who owes them, not by the attorney who billed them. Incur means "to become liable or subject to: bring down upon oneself." (Merriam-Webster's Collegiate Dict. (11th ed. 2006), p. 632, col. 1.) A client does not incur attorney fees he did not agree to pay. The appellate court expanded section 1036 beyond its clear meaning.

Plaintiffs argue *Andre* fails to follow other appellate precedents, many cited by *Salton Bay Marina*, where courts reviewed a contingency fee agreement as only one factor to consider when determining the reasonableness of a fee award. Most of the cases plaintiffs cite, however, did not arise under section 1036 with its specific award of only fees actually incurred. (See, e.g., *Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 [fees awarded under private attorney general theory]; *People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1759 [fees awarded in eminent domain action under Code of Civil Procedure section 1250.410 for agency's unreasonable final offer]; *City of Oakland v. Oakland Raiders* (1988) 203 Cal.App.3d 78, 81, 83-84 [fees awarded under Code of Civil Procedure section 1268.610 after eminent domain action abandoned]; *Glendora Community Redevelopment Agency v. Demeter* (1984) 155 Cal.App.3d 465, 472 [same].)

Other cases plaintiffs cite provide little guidance. *Aetna Life & Casualty Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 865 (*Aetna Life*), reviewed fees awarded under section 1036 in conformance with a contingency agreement, but the Court of Appeal determined the fees awarded were excessive and unreasonable. (*Id*. at p. 882.) Like *Salton Bay Marina*, the issue of awarding fees exceeding the contingent agreement provision did not arise. (*Aetna Life, supra,* 170 Cal.App.3d at pp. 880-881.)

*Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 193 concerned the trial court's discretion to award fees under section 1036 for claims connected to a claim of inverse condemnation using the loadstar method. Although the Court of Appeal affirmed the award, the issue of fees actually incurred was not raised, and there was no evidence a contingency agreement existed.

Similar federal authority is in conflict. Plaintiffs rely on *Washington Metropolitan Area Transit Authority v. United States* (Fed.Cl. 2003) 57 Fed.Cl. 148, 152-153 (*Washington Metro*), but the case actually supports *Andre*'s reasoning. The federal Court of Claims determined the words "actually incurred," as used in the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (URA), did not allow a fee award in an inverse condemnation case to be based on market rates, but rather limited fee awards to fees actually incurred. In that case, the court limited fees for services from in-house counsel to the amounts counsel would receive in salary, as opposed to the market rate for private counsel.

*Washington Metro* determined an earlier case, *Shelden v. United States* (Fed.Cl. 1998) 41 Fed.Cl. 347, relied upon by plaintiffs because it awarded fees under the URA based on a loadstar method despite the existence of a contingency fee agreement, was incorrectly decided. It had relied on authorities that interpreted fee statutes which did not require fees to be actually incurred, and was "irreconcilable with the limiting language of the statute." (*Washington Metro, supra,* 57 Fed.Cl. at p. 153; see *United States v. 122.00 Acres of Land* (8th Cir. 1988) 856 F.2d 56 [URA's requirement that fees were actually

59

incurred prevented award of fees where contingency agreement promised no fees where there was no recovery].)

As to other cases that disregard a contingency agreement when determining fees that were actually incurred, we chose not to follow them for the reasons stated above. (See *United States v. $186,416.00 in U.S. Currency* (9th Cir. 2011) 642 F.3d 753, 755 [recovery of fees under federal Civil Asset Forfeiture Reform Act, 28 U.S.C. § 2465(b)(1)(A), for fees "reasonably incurred" required award based on lodestar method; contingency fee agreement did not act as a cap on the award]; *Applegate v. United States* (Fed.Cl. 2002) 52 Fed.Cl. 751, 759, affd., *Applegate v. United States* (Fed.Cir. 2003) 70 Fed.Appx. 582 [URA did not apply because parties agreed to attorney fee award in settlement agreement, but if URA applied, statute's "actually incurred" language did not limit award to contingency fee agreement]; *Marshall v. Department of Water & Power* (1990) 219 Cal.App.3d 1124, 1150 [award of fees in inverse condemnation action reversed where trial court adhered to contingency agreement (33 1/3 percent) and awarded attorneys thirty cents based on judgment of $1].)

Because section 1036 limited attorney fees to those actually incurred, we conclude the trial court correctly awarded plaintiffs an award of fees equal to the amount they were obligated to pay under their contingency agreement.

DISPOSITION

The case is remanded to the trial court solely for the determination and award of

appropriate flowage easements to the Department.  In all other respects, the judgment is affirmed except as to the Coastal Commission, for which it is reversed.  Each party shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


      NICHOLSON      , Acting P. J.


We concur:


      BUTZ      , J.


      MURRAY      , J